## (May 27, 1968)

1   Edith Inverso, as Administratrix of the Estate of Anthony Inverso, Deceased, Appellant, v. Whitestone Transit Mix Corporation et al., Respondents.— In an action to recover damages for wrongful death, plaintiff appeals from a judgment of the Supreme Court, Kings County, dated February 3, 1967, in favor of defendants, upon the trial court's dismissal of the complaint at the end of plaintiff's case upon a jury trial. Judgment reversed, on the law, and new trial granted, with costs to appellant to abide the event. No questions of fact were considered on this appeal. On August 6, 1964, before 8:00 A.M., plaintiff's intestate (a laborer employed by Lawrence Concrete Corporation) was assisting in loading a truck with stone from twin hoppers, when the hoppers collapsed, causing the stone to strike and bury him under it, as a result of which he sustained fatal injuries. The hoppers had been installed in 1960 by placing the legs of the hoppers on wooden timbers and spiking them down to the timbers. The timbers were not anchored, but merely rested on the ground and not on concrete footings. The hoppers were described by plaintiff's witnesses as portable and movable. In 1961 defendant Whitestone purchased the real property on which the hoppers in question were located as part of a ready-mix concrete plant. On July 1, 1964 Whitestone leased the premises, together with the equipment thereon (which included the hoppers), to defendant Hickey for two years for use as a plant for the manufacture, sale and distribution of ready-mix concrete. Hickey was required by the lease to make all repairs to the premises and equipment and to hold Whitestone harmless from damage or liability resulting from any accident on the premises. The premises were leased in an "as is" condition and Hickey represented that he had inspected same prior to the signing of the lease. On August 3, 1964 Hickey assigned the lease to Lawrence Concrete Corporation (of which corporation Hickey was president). Lawrence Concrete assumed all the obligations of the lease, but Hickey was not released from his obligations thereunder. The plant went into operation that day. The accident happened three days later. Plaintiff's proof was sufficient to enable a jury to find that the hoppers had been improperly and insecurely installed in that the legs of the hoppers were not anchored to concrete foundations by means of bolts and that defendants continued to maintain these hoppers in this patently dangerous and defective condition. In our opinion, plaintiff proved a prima facie case of liability against both defendants on several theories: (1) If the hoppers were in fact personal property, as plaintiff claims and as the testimony indicates, then, since the hoppers were leased as part of a ready-mix concrete plant, both defendants impliedly warranted that the hoppers were fit and suitable for the purpose intended (*Hoisting Engine Sales Co.* v. *Hart*, 237 N. Y. 30). The use by plaintiff's intestate of the hoppers was within the reasonable contemplation of defendants and, therefore, plaintiff was entitled to sue for breach of the implied warranty (*Goldberg* v. *Kollsman Instrument Corp.*, 12 N Y 2d 432; *Thomas* v. *Leary*, 15

A D 2d 438). Whether the hoppers were personalty, in which case (as plaintiff claims) there was a warranty of fitness for use, or part of the real property, in which case (as defendants claim) there was no warranty, was a question of fact to be determined by the jury. The test is whether the hoppers were annexed to the realty in such manner as to become an integral and permanent part of the realty or whether they were temporarily installed for the use and convenience of a tenant (*Sigrol Realty Corp.* v. *Valcich*, 12 A D 2d 430, affd. 11 N Y 2d 668). (2) Defendant Hickey was under a continuing duty to make repairs under the terms of the lease and was in sufficient control of the premises to fasten liability on him for his negligence, even after the assignment of the lease to the corporation of which he was president. The original lease was made by Whitestone to Hickey in order to have Hickey's personal liability on the lease. The fact that Hickey thereafter assigned the lease to a corporation of which he was president did not relieve Hickey of his obligations thereunder. Even after the assignment of the lease by Hickey to his corporation, Hickey had the right, in his independent discretion, to enter the premises at any and all times and make repairs upon his own responsibility. He kept and retained a general supervision over the premises. He had the right to come and go upon the leased premises as he pleased for the purpose of inspection and repair and was at liberty to correct any defect as soon as it was found. Therefore, Hickey reserved a privilege of ownership sufficient to give rise to liability in tort (*De Clara* v. *Barber S. S. Lines*, 309 N. Y. 620). In any event, Hickey's liability continued even after the assignment of the lease until the assignee had a reasonable opportunity to make the necessary repairs (*Pharm* v. *Lituchy*, 283 N. Y. 130). (3) The evidence is not clear whether the premises were intended for use, or had been used, by a large number of persons who visited the premises as patrons. If such were the case, defendants would be liable to this plaintiff if the hoppers were defective, to the knowledge of defendants, at the time the lease was made (as to Whitestone) and at the time the assignment of the lease was made (as to Hickey), even though they did not create the nuisance (*Timlin* v. *Standard Oil Co.*, 126 N. Y. 514; *Warner* v. *Lucey*, 207 App. Div. 241, affd. 238 N. Y. 638; *Campbell* v. *Holding Co.*, 251 N. Y. 446). The evidence is sufficient to show prima facie that each defendant knew or should have known, at the said time referrable to it or him, of the improper and inadequate installation of the hoppers. The fact that the "premises" were leased by Whitestone to Hickey in an "as is" condition does not mean that the equipment on the premises in the nature of personal property was also leased in an "as is" condition. But even if the "as is" provision extended to the equipment as well as to the premises, that covenant in the lease was binding only as between the parties to the lease and may have had the effect of preventing Hickey from claiming over as against Whitestone. However, it had no effect on the liability of defendants to plaintiff. In a death case, the plaintiff is not to be held to as high a degree of proof of the cause of action as where an injured plaintiff can himself describe the occurrence (*Noseworthy* v. *City of New York*, 298 N. Y. 76, 80).

BENJAMIN, J. (dissenting). The majority of our court has, in my opinion, by its decision in this case, expanded the liabilities imposed by section 96 of the Personal Property Law [now covered by Uniform Commercial Code, § 2–314 through § 2–318, eff. Sept. 27, 1964] far beyond any interpretation previously placed upon it by any decision of our State courts, and has expanded the doctrine of products liability into a new area. This action arose out of the collapse of large twin hoppers located at the plant of the Lawrence Concrete Corporation, used for the loading of stone, gravel or concrete. The

accident resulted in the death of the plaintiff's intestate, a laborer employed by the Lawrence Concrete Corporation. The twin hoppers involved were installed in 1960 by a prior owner of the property. In 1961, defendant Whitestone acquired the property, including the hoppers and all other machinery, equipment and fixtures contained upon the property. Thereafter, the premises had a checkered career. In 1961, they were leased to North Shore Transit Mix Corp. which operated the plant for approximately two years. It then went bankrupt and vacated the premises. From that time until July, 1964, the premises remained unoccupied and vacant. As the majority of the court has noted, Whitestone then leased the property on July 1, 1964, together with all the machinery, equipment and fixtures therein contained, including these hoppers, to defendant Hickey for the manufacture, sale and distribution of ready-mixed concrete. The lease was an entire lease of everything contained on the premises. There was no separation of rent for real estate, machinery and fixtures, the total net rental being $30,000 a year. By the terms of this lease [again, as noted by the majority of the court], Hickey was obligated to make all repairs to the premises and equipment. The premises were expressly leased in an " as is " condition. The tenant represented that he had inspected the premises prior to the signing of the lease. By clause 33 of the lease, an option to purchase was given to the tenant; the clause described the entire premises as a lease of real property; and the tenant was given the right to acquire all of the property upon the terms contained in the option. With the making of the lease, complete control of the property passed to the tenant, Hickey. On July 13, 1964, employees of Lawrence Concrete Corp., under the direction of Hickey, came to the premises for the purpose of going over the plant, including the hoppers in issue, in order to make it ready for operation. On August 3, 1964, the plant went into operation, and on that day Hickey assigned his lease from Whitestone to the Lawrence Concrete Corporation retroactively, as of July 1, 1964, the date on which Hickey had entered into his lease with Whitestone, so that, for all legal and practical purposes, the operation and control of this property from July 1 to the date of the accident in question was in the employer of the intestate. The accident happened on August 6, a month and six days after the making of the lease and 24 days after the Lawrence Concrete workers came to the plant for the purpose of making whatever repairs were necessary to make it safe and operable. No proof was presented by the plaintiff to establish that when these hoppers were installed by the prior owner in 1960 they constituted a nuisance, or that they did not in every respect comply with all the provisions of law applicable to the installation and operation of such machinery and equipment as incidental to a concrete plant; nor is it contended on this appeal that any such violation of law existed. The evidence wholly failed to establish the existence, at the time of the making of this lease, of any known defective condition which rendered these hoppers inherently dangerous for use. The expert Goldberg, called by the plaintiff, testified that these hoppers in good practice might have been annexed to the premises by a different and stronger method than that employed, but he failed to testify that the method employed did not comply with the standards required by law. He further testified that weaknesses, if any, resulting from the method of installation, were not visible to the naked eye: " Q. Nobody could tell with the naked eye? Nobody could tell with the naked eye, could they, that there is anything wrong with this structure? A. Right. Q. As a matter of fact, even people in the business wouldn't know that there is anything wrong? A. Absolutely correct. Q. In other words, it's just one of those things, that

your opinion is that whoever put it in put it in wrong, according to you, and nobody would know it until it collapsed? A. Absolutely. Q. So that, sir, you, Mr. Vaccaro, I, anybody, whether they are in this business or not, we could be working under it, sitting around it, own it, manage it, we wouldn't know there is a thing wrong with it until it collapsed. Is that right? A. Right. Q. The first thing anybody would know would be after the accident occurred? A. Yes. Q. So it's one of those things that unless you put it in, you would never know that it happened and it's just one of those things? A. Absolutely right." We, therefore, deal here with a situation involving a latent defect, if any such defect existed at all, not visible to the naked eye; not even to that of an expert. There is no proof that the manner in which these hoppers were annexed is not entirely in accordance with the requirements of law. It is not contended, and certainly the record will not sustain any such contention, that there were defects known to these defendants which they failed to communicate to the tenant Lawrence Concrete so that it could remedy them in time to prevent the happening of this accident. Upon this record, the trial court, and in our opinion properly, dismissed the complaint at the close of the plaintiff's case. The majority of our court has voted for the reversal of this judgment of dismissal and for a new trial upon two alternative or cumulative theories: First, it is their contention that the hoppers in question might be found by a jury to be personal property and, if that be so, then the lease of the premises, including these hoppers, carried with it an implied warranty of fitness for purpose of this equipment contained within the premises. In support of this theory, they have cited *Hoisting Engine Sales Co.* v. *Hart* (237 N. Y. 30); *Goldberg* v. *Kollsman Instrument Corp.* (12 N Y 2d 432); and *Thomas* v. *Leary* (15 A D 2d 438). In all of these products liability cases, liability has been fixed upon those dealing with specific items of equipment sold or leased for a specific amount of dollars for such item of personal property only. Thus, in *Thomas* v. *Leary* (*supra*), we dealt with a collapsed dentist chair. *Hoisting Engine Sales Co.* v. *Hart* (*supra*) involved a specific crane. The *Goldberg* v. *Kollsman Instrument Corp.* case (*supra*) was a case in which an airplane manufacturer was held liable for a defective airplane causing the death of a passenger. It is obvious that these cases are inapt since here we are dealing with not the sale or lease of a specific item of personal property, but a lease of real estate involving machinery, equipment and fixtures leased in their entirety with an express negation of any warranty of fitness for purpose, express or implied. The suggestion that a person entering upon the premises could recover on the products liability theory of warranty when the parties to the agreement had themselves eliminated such warranty from their transaction is a strange and new approach to the doctrine of products liability, never before entertained by the courts of our State. While an existing warranty of fitness may be extended to an ultimate consumer, it cannot be implied in favor of a consumer when it is nonexistent as to the original purchaser or lessee. How such a liability can attach to defendant Hickey is particularly unclear since Hickey in this case did not even make a lease; he merely assigned his lease as tenant to the Lawrence Concrete Corporation, transferring whatever rights he had under his lease with Whitestone. Certainly no representation, express or implied, of warranty could be spelled out from such an assignment. The liability of Whitestone or Hickey for such implied warranty of fitness for purpose must be found within the four corners of section 96 of the Personal Property Law or it is non-existent. Subdivision 6 of section 96, states: "An express warranty or *condition* does not negative a warranty or condition implied under this article unless inconsistent therewith" (emphasis supplied). Here, the lease was made under the express condition that the

premises were leased "as is". Such an expression is, of course, inconsistent with any implied warranty of fitness. In any event, no express sale or lease was made of any piece of personal property contained within the demised premises. Section 96 relates to sales of goods as such and not to the presence within a plant of equipment and fixtures which passed under the terms of an indenture of lease to a tenant as part of an entire transaction. Nor in fact does this theory of alleged breach of warranty find substance within the four corners of the complaint itself. The complaint is founded upon the alleged breach of a common-law duty to disclose a known and dangerous condition. No proof was presented by the plaintiff on the trial to establish that either of the defendants knew of a dangerous condition. In fact, the testimony of the plaintiff's expert Goldberg negates any suggestion that the existence of such a condition was patent upon inspection. We deal, then, with the second question, as to whether an owner of real property who makes a lease with a tenant remains liable for damages flowing from latent, defective conditions in the premises. We turn now to the leading cases on this question: *Cullings* v. *Goetz* (256 N. Y. 287); and *Kilmer* v. *White* (254 N. Y. 64, 69). *Kilmer* v. *White* (*supra*) relates to an accident that happened on October 31, 1927, three days after the defendant had conveyed premises to a new owner. On that day, a railing of a piazza in the rear of the plaintiff's apartment in the premises collapsed, causing him to fall and sustain injuries. Judge POUND expressed the general rule as excluding liability in negligence for the condition of land after the premises passed out of one's control, barring misconduct by the seller, by concealing dangerous conditions when known to him, as by painting over, or by giving false assurances in regard thereto, thereby preventing the purchaser from learning of concealed defects by making a proper inspection. It is not contended that any fraud or concealment existed in this case. Shortly thereafter, Judge Cardozo, in the landmark case of *Cullings* v. *Goetz* (*supra*), reiterated the doctrine as follows (pp. 291–292): "The doctrine, wise or unwise in its origin, has worked itself by common acquiescence into the tissues of our law. It is too deeply imbedded to be superseded or ignored. Hardly a day goes by in our great centers of population but it is applied by judges and juries in cases great and small. Countless tenants, suing for personal injuries and proving nothing more than the breach of an agreement, have been dismissed without a remedy in adherence to the authority of *Schick* v. *Fleischhauer* [26 App. Div. 210] and *Kushes* v. *Ginsberg* [188 N. Y. 630]. Countless visitors of tenants and members of a tenant's family have encountered a like fate. If there is no remedy for the tenant, there is none for visitors or relatives present in the tenant's right (*Miles* v. *Janvrin*, [196 Mass. 431] *supra*, at p. 440; *Elefante* v. *Pizitz*, 182 App. Div. 819, 821). Liability has been enlarged by statute where an apartment in a tenement house in a city of the first class is the subject of the lease (*Altz* v. *Lieberson*, 233 N. Y. 16). The duty in such instances is independent of the contract. It is one imposed by law, with liability in tort where the duty is ignored. Here the plaintiff was injured in the use of a garage. His remedy is against the tenant at whose invitation he was there." Those cases which have been cited which would appear to support a contrary doctrine are all cases where dangerous conditions existed, known to the landlord and not expressly made known to the tenant, resulting in an accident within a period of time too soon after the transfer of title to permit of a repair being made. So in *Warner* v. *Lucey* (207 App. Div. 241, affd. 238 N. Y. 638), liability for a falling elevator in a garage was fixed upon prior lessors when it appeared that they had knowledge of a dangerous condition and nevertheless rented the premises for use by the general public. The accident occurred 17 days after making

the lease — a time insufficient to enable the making of the required repairs. Likewise, in *Farragher* v. *City of New York* (26 A D 2d 494, affd. 21 N Y 2d 756), liability was fastened upon a vendor of real property who, on June 4, 1962, sold a piece of property upon which a violation existed for the installation of a sprinkler system, which violation had been on the premises for more than a year and a half before a fire on the premises occurred. The owner, nevertheless, in violation of law, had failed to comply, with the result that on July 12, 1962, one month and eight days after the sale, a fireman was killed fighting the fire. Here again, liability was predicated upon the failure of the prior owner in possession to comply with an express mandate of law, resulting in the death of the fireman in question when the evidence established that it would not have been possible to remove this violation in less than 90 days after the taking of title. No such special circumstances exist in this case. Here, there was no claim of failure to comply with a mandate of law; there was no showing of any knowledge of any defective condition; there was no claim that the condition was inherently a nuisance; merely a contention that better building practice would have mandated a different method of annexation than that actually employed even though the one employed, as far as this record is concerned, was fully consonant in law. Here, too, the record establishes that, more than three weeks before the happening of this event, the employer of the intestate entered into possession of the premises for the purpose of making all repairs that were necessary before the plant actually went into operation. Whatever was visible to the prior owners was visible to him. The premises were not leased to him for immediate possession and for the use of the public; on the contrary, they were leased to him in an "as is" condition and as a vacated bankrupt plant. Until his repairs were completed, there was no representation, express or implied, which would justify his entering into the actual use of the hoppers and putting them to the test of the tremendous tonnage to which they were exposed without making sure that the ravages of time and use had not so weakened them that they required reinforcement. As Judge CARDOZO so succinctly stated in the *Cullings* case (256 N. Y. 287, *supra*), time and usage and the needs of a market place have deeply imbedded into our common law the practicability of the rule for which the minority here contend. Sales and leases of rundown properties requiring rehabilitation are a common practice. Under our urban redevelopment schemes, properties dilapidated by the ravages of time, fire and accident are constantly being leased or sold in an "as is" condition, with a view toward their being restored to a proper condition to be used by the new owners or lessees. To impose a continuing liability upon the prior owners or lessors in possession would unduly negate the impact of the exculpatory clause of selling or leasing in an "as is" condition, such as is contained in the indenture of lease with which we are here concerned. All that Whitestone had done here was to lease bankrupt property to a new tenant who was to recondition it and place it into use. To fasten liability upon Whitestone for the failure of the lessees to perform their responsibility in reconditioning the property is to overrule *Cullings* v. *Goetz* (256 N. Y. 287, *supra*) and *Kilmer* v. *White* (254 N. Y. 64, *supra*). To hold Hickey responsible merely because he assigned his lease on a residual secondary obligation to perform under the terms of the lease, so far as the landlord is concerned, is certainly to stretch any theory of responsibility as against prior parties in possession into a doctrine beyond recognition. Many leases of entire properties in our urban community have many intervening assignors. Since the right to assign is usually made contingent upon a continued responsibility to the landlord in the event of default by the tenant, the effect of the decision of the majority of our court would be to impose

liability for accidents, such as this, upon all such intervening assignees of the lease, whatever their number, and without regard to the time interval of their actual possession during the life of a long-term lease, on the theory of continuing control because of such secondary liability. It was to prevent such an anomaly encrusted upon the law that Judge Cardozo used the forceful language employed in *Cullings* v. *Goetz* (*supra*). Since, therefore, we have here no definable lease of an item of personal property in this transaction which involves a single rental for an entire plant, and since we have here no fraud or concealment on the part of the lessor out of possession with respect to the condition of the premises or any showing of even knowledge of any defective condition, it follows that no basis for liability exists and the determination below should be affirmed.

Beldock, P. J., Rabin and Munder, JJ., concur in Memorandum; Benjamin, J., dissents and votes to affirm the judgment, in opinion, in which Brennan, J., concurs.

Judgment reversed, on the law, and new trial granted, with costs to appellant to abide the event. No questions of fact were considered on this appeal.